# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| THOMAS JOSEPH WHITE, ) <br> ) <br> Plaintiff, ) <br> ) <br> v. ) <br> ) <br> COMMISSIONER OF SOCIAL SECURITY, ) <br> ) <br> Defendant. ) <br> ) <br> _____ ) | Case No.: 1:18-cv-1720 - JLT <br><br> ORDER DIRECTING ENTRY OF JUDGMENT IN FAVOR OF DEFENDANT, THE COMMISSIONER OF SOCIAL SECURITY AND AGAINST PLAINTIFF THOMAS JOSEPH WHITE |

Thomas Joseph White asserts he is entitled to supplemental security income under Title XVI of the Social Security Act. Plaintiff seeks judicial review of the decision to deny his application for benefits, arguing the administrative law judge erred by not developing the record. In addition, Plaintiff contends the Appeals Council erred by not evaluating new evidence submitted with his request for review. For the following reasons, the administrative decision is **AFFIRMED**.

## **BACKGROUND**

In June 2014, Plaintiff filed an application for benefits, asserting he had been unable to work since May 1, 2011, due to depression, anxiety, back problems, and "[l]eft leg numbness and pain." (Doc. 12-9 at 2; Doc. 12-10 at 6) The Social Security Administration denied the applications at the initial level on November 5, 2014, and upon reconsideration on December 1, 2015. (Doc. 12-3 at 33; *see also* Doc. 12-8 at 2-5, 10-15) Plaintiff requested a hearing and testified before an ALJ, without representation of counsel, on October 24, 2017. (*See* Doc. 12-6 at 43-46) The ALJ determined

Plaintiff was not disabled under the Social Security Act, and issued an order denying benefits on January 31, 2018. (Doc. 12-3 at 33-46)

On February 14, 2018, Plaintiff filed a request for review of the ALJ's decision with the Appeals Council. (Doc. 12-8 at 61) He requested the Appeals Council review the decision because he "suffer[ed] from schizophrenia, bipolar disorder, and lumbar spine pain." (*Id.*) Plaintiff obtained representation, after which the Appeals Council granted a request for additional time before it acted on Plaintiff's case. (*See* Doc. 12-3 at 9) The Appeals Council informed Plaintiff:

> You may send us a statement about the facts and the law in this case or additional evidence. We consider additional evidence that you show is new material and relates to the period on or before the date of the hearing decision. You must also show there is a reasonable probability that the additional evidence would change the outcome of the decision. You must show good cause for why you missed informing us about or submitting it earlier.

(*Id.*)

Plaintiff submitted over 180 pages of evidence to the Appeals Council. (Doc. 12-3 at 3) The Appeals Council determined 68 pages of the records submitted did not relate to the period in issue, because they post-dated the ALJ's decision. (*Id.*) The Appeals Council found the remaining additional evidence did "not show a reasonable probability that it would change the outcome of the decision." (*Id.*) The Appeals Council denied Plaintiff's request for review on October 25, 2018. (*Id.* at 2-5) Therefore, the ALJ's determination became the final decision of the Commissioner of Social Security.

## STANDARD OF REVIEW

District courts have a limited scope of judicial review for disability claims after a decision by the Commissioner to deny benefits under the Social Security Act. When reviewing findings of fact, such as whether a claimant was disabled, the Court must determine whether the Commissioner's decision is supported by substantial evidence or is based on legal error. 42 U.S.C. § 405(g). The ALJ's determination that a claimant is not disabled must be upheld by the Court if the proper legal standards were applied and the findings are supported by substantial evidence. *See Sanchez v. Sec'y of Health & Human Serv.*, 812 F.2d 509, 510 (9th Cir. 1987).

Substantial evidence is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S.

2

389, 401 (1971) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197 (1938)). The record as a whole must be considered, because "[t]he court must consider both evidence that supports and evidence that detracts from the ALJ's conclusion." *Jones v. Heckler*, 760 F.2d 993, 995 (9th Cir. 1985).

## DISABILITY BENEFITS

To qualify for benefits under the Social Security Act, Plaintiff must establish he is unable to engage in substantial gainful activity due to a medically determinable physical or mental impairment that has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. § 1382c(a)(3)(A). An individual shall be considered to have a disability only if:

> his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work, but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 1382c(a)(3)(B). The burden of proof is on a claimant to establish disability. *Terry v. Sullivan*, 903 F.2d 1273, 1275 (9th Cir. 1990). If a claimant establishes a prima facie case of disability, the burden shifts to the Commissioner to prove the claimant is able to engage in other substantial gainful employment. *Maounis v. Heckler*, 738 F.2d 1032, 1034 (9th Cir. 1984).

## ADMINISTRATIVE DETERMINATION

To achieve uniform decisions, the Commissioner established a sequential five-step process for evaluating a claimant's alleged disability. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). The process requires the ALJ to determine whether Plaintiff (1) is engaged substantial gainful activity, (2) had medically determinable severe impairments (3) that met or equaled one of the listed impairments set forth in 20 C.F.R. § 404, Subpart P, Appendix 1; and whether Plaintiff (4) had the residual functional capacity to perform to past relevant work or (5) the ability to perform other work existing in significant numbers at the state and national level. *Id.* The ALJ must consider testimonial and objective medical evidence. 20 C.F.R. §§ 404.1527, 416.927.

**A.  Medical Evidence before the ALJ**

On January 21, 2012, Plaintiff's mother took him to the emergency department of Kaweah Delta Hospital, reporting "mood swings and threats." (Doc. 12-13 at 6) Dr. Serena Puga noted

Plaintiff described a "longstanding history of anger management issues" and "had been spiraling downward in the context of recent homelessness and no where to turn." (*Id.*) Dr. Puga noted that Plaintiff was "trying to get Mental Health Services from Kings County Clinic but he present[ed] so angry and verbally abusive that he … alienated them" and was not getting the help Plaintiff believed he needed. (*Id.*) Dr. Puga observed that Plaintiff's speech was "peppered constantly with angry expletives and his tone [was] hostile and pressured," and he made "provocative threats towards other patients in the hospital and veiled threats to murder others, such as his postman." (*Id.*) Plaintiff admitted a history of methamphetamine use, but said it was "resolved," and use of medical marijuana "to calm his anger." (*Id.* at 7) Plaintiff was admitted for mental health treatment, and Dr. Puga opined his admission should be minimized "to avoid paradoxical reinforcement of maladaptive behavior." (*Id.* at 8) Upon admission, the treatment goals included reduction of substance abuse side effects; lessening the risk of violence towards others, anxiety, and impulsivity; and improvement of mood. (*Id.* at 10) The following day, Plaintiff was observed to be alert, oriented, cooperative, calm and "not in any distress." (*Id.* at 12, 14) Plaintiff was discharged on January 24, 2012, with instructions to follow up with Kings View Mental Health. (*Id.* at 15)

In May 2013, Plaintiff visited a physician at Adventist Health Central Valley Network for medication management for his low back pain. (Doc. 12-12 at 16) Plaintiff reported his pain level at the time was a "0" on a scale of 10. (*Id.*) The treatment notes indicated Plaintiff's condition was stable. (*Id.*)

In June 2013, Plaintiff described his low back pain as a "5." (Doc. 12-12 at 15) Plaintiff's musculoskeletal and neurological examinations were within normal limits, and he was directed to return on an as-needed basis. (*Id.*)

Plaintiff returned to Adventist Health in September 2013. (Doc. 12-12 at 14) The treatment notes indicated Plaintiff had a history "of bipolar and anxiety disorder" schizophrenia, and chronic low back pain. (*Id.* at 13-14) Plaintiff requested a prescription of Vicodin. (*Id.* at 14) Dr. Reddy observed that Plaintiff was sweating and anxious. (*Id.*) Plaintiff's range of motion was within normal limits and he had "intact sensation." (*Id.*) Plaintiff received the requested Vicodin and was directed to return in five days. (*Id.*) At an appointment two days later, Plaintiff had a full range of motion in his neck and a

negative straight leg raise test. (*Id.* at 13) Dr. John Zweifler noted Plaintiff would be tapered off Norco, but would continue with Risperdal. (*Id.*)

In April 2014, Plaintiff visited Dr. Zweifler, who noted Plaintiff had not been evaluated for two-to-three months and was there for bipolar disorder management. (Doc. 12-12 at 10) Plaintiff told Dr. Zweifler that he was taking Risperdal daily and that it helped, but he was not seeing a psychiatrist. (*Id.*) Dr. Zweifler noted he directed Plaintiff to stop Vicodin in 2013, and Plaintiff said his pain was "eased with exercises from [physical therapy]." (*Id.*) Plaintiff reported he also heard voices. (*Id.*) Dr. Zweifler found Plaintiff had normal range of motion, strength, gait, and deep tendon reflexes. (*Id.* at 11) He indicated Plaintiff continued to have schizoaffective disorder, chronic back pain, and a problem relating to social and personal history, but was "[p]rogressing as expected." (*Id.* at 11-12)

In July 2014, Dr. Zweifler noted Plaintiff returned for medication management and reported occasional cramping in his hands and back pain. (Doc. 12-12 at 6) Plaintiff told Dr. Zweifler that his medication was "definitely helping" with his anger and he felt "more relaxed and calm." (*Id.*) Plaintiff was "[r]equesting opioids," which Dr. Zweifler advised Plaintiff are "addictive." (*Id.* at 8) Dr. Zweifler refilled the prescription for risperdol and indicated Plaintiff could "[t]ry tramadol." (*Id.*)

Dr. Lance Portnoff performed a comprehensive psychiatric evaluation on September 18, 2014. (Doc. 12-12 at 23) Plaintiff reported that he suffered from depression, anxiety, back problems, and left leg numbness and pain. (*Id.*) He told Dr. Portfnoff that he heard "audible voices of people talking to him, maybe lasting 3-5 minutes, 5-7 times a week, calling his name or having conversations among themselves." (*Id.*) Plaintiff also stated he had mood swings, was quickly angered, and had "uncured panic attacks 5-8 times a week." (*Id.*) Dr. Portnoff noted he could not "get a clear picture of discrete manic episodes or how long they last or how frequently they [occurred]." (*Id.*) Plaintiff attributed his depression to being homeless and unable to see his son as much as he wanted. (*Id.* at 24) Plaintiff said he did "not need help with bathing, dressing, and grooming, and [had] adequate motivation for them." (*Id.*) He also stated he could travel alone, prepare food for himself, and manage money. (*Id.*) Plaintiff acknowledged a history of methamphetamine abuse and said he had been "clean for three years." (*Id.*) He told Dr. Portnoff that he "use[d] medical cannabis for pain and stress." (*Id.*)

Dr. Portnoff observed that Plaintiff appeared "casually-dressed, adequately groomed" and

maintained good eye contact. (Doc. 12-12 at 24) According to Dr. Portnoff, Plaintiff's process of thought was "coherent but mildly rambling and occasionally tangential," and the content of thought was "appropriate to the situation," though Plaintiff seemed preoccupied. (*Id.* at 25) However, he believed Plaintiff "demonstrate[d] adequate concentration, persistence, and pace" during the exam. (*Id.*) Plaintiff was able to recall three words immediately and two out of three words after a delay of several minutes. (*Id.* at 25) Dr. Portnoff diagnosed Plaintiff with "Schizoaffective Disorder, Bipolar Type," based upon his "available history and presentation." (*Id.* at 26) Dr. Portnoff concluded Plaintiff was "able to perform simple and repetitive tasks," but had "marked limitations in his ability to perform detailed and complex tasks due to deficit in mental focus and frequent hallucinations." (*Id.*) He also opined Plaintiff had "has moderate limitations in his ability to work on a consistent basis without special or additional instruction due to psychiatric problems." (*Id.*) Further, Dr. Portnoff believed Plaintiff had "marked limitations" with his ability to interact with the public and coworkers, and "to complete a normal workday or workweek without interruptions from a psychiatric condition due to schizoaffective symptoms." (*Id.*)

Dr. Dale Van Kirk completed an orthopedic consultation on October 15, 2014. (Doc. 12-12 at 30) Plaintiff reported pain in his neck and low back, which radiated down his left leg. (*Id.*) Plaintiff said his "neck pain increase[d] if he [had] to repetitively flex and extend at the neck, reach overhead, push, pull, or [make] rotary motions of the upper extremities. (*Id.* at 31) Also, his back pain increased if he had "to lift heavy objects, test, turn, climb, run, jump, squat, go up and down ladders, go up and down stars frequently, crouch, crawl or even attempt to do these activities." (*Id.*) Plaintiff reported his treatment included chiropractic care and physical therapy, "both of which … helped somewhat." (*Id.*) Dr. Van Kirk observed that Plaintiff sat "comfortably in the examination chair" and "without difficulty" was able to get up and out of the chair, walk around the room, and get on and off the table. (*Id.* at 32) Dr. Van Kirk noted Plaintiff could "get up on his toes and heels" and "squat down and take a few steps… without difficulty." (*Id.*) Plaintiff exhibited "slight pain" in the cervical spine, and Dr. Van Kirk noted Plaintiff "[s]lowly but surely … [went] through a full range of motion of the cervical spine." (*Id.*) Plaintiff's range of motion of the lumbar spine was reduced from 90 degrees to 70 with flexion, from 25 degrees to 20 with extension, and from 25 degrees with lateral flexion to 20 degrees.

6

(*Id.*) He was able to rotate 30 degrees, while the normal was 25 degrees. (*Id.*) Dr. Van Kirk found Plaintiff had a "full range of motion without pain or difficulty" in his hip joints, knee joints, ankles, shoulders, elbows, [and] wrists." (*Id.* at 33) He also determined Plaintiff's grip strength was 5/5 bilateral and his motor strength was 5/5. (*Id.*) He found Plaintiff's deep tendon reflexes were "present only in the biceps reflexes in the upper extremities" and his patellar reflexes were 1+/4. (*Id.*) Dr. Van Kirk diagnosed Plaintiff with "[c]hronic cervical and lumbosacral musculoligamentous strain/sprain, possibly associated with degenerative disk disease." (*Id.*) He concluded Plaintiff could "sit without restriction," "stand and/or walk accumulatively six hours out of an eight hour day," and "lift and carry frequently 25 pounds and occasionally 50 pounds." (*Id.* at 34) Further, Dr. Van Kirk opined Plaintiff was "limited to frequent postural activities" and "should not be required to work an extremely cold and/or damp environment." (*Id.*)

Dr. Dara Goosby completed a residual functional capacity assessment on October 24, 2014. (Doc. 12-7 at 8) Dr. Goosby noted Plaintiff's impairments included "Schizophrenia and Other Psychotic Disorders" and "Substance Addition Disorder[]." (*Id.* at 7) Dr. Goosby observed that Plaintiff had been in the hospital "years ago," and the recent medical record was "minimal." (*Id.*) She found the record indicated "improvement of [symptoms]"—which appeared "in the moderate range of severity" —and that Plaintiff was independent with activities of daily living. (*Id.* at 7, 9) According to Dr. Goosby, Plaintiff had mild restriction of activities of daily living; moderate difficulties maintain social functioning; and moderate difficulties in maintaining concentration, persistence, or pace. (*Id.* at 7) Dr. Goosby concluded Plaintiff was "capable of simple work in a setting with no public and limited peer contact." (*Id.*)

Dr. A. Nasrabadi completed a physical residual functional capacity assessment on November 4, 2014. (Doc. 12-7 at 9-10) According to Dr. Nasrabadi, "objective clinical findings were minimal" from the consultative examination. (*Id.*) Dr. Nasrabadi opined Plaintiff could lift and carry 25 pounds frequently and 50 pounds occasionally, stand and/or walk for about six hours in an eight-hour day, and sit about six hours in an eight-hour day. (*Id.* at 9-10) Dr. Nasrabadi found Plaintiff was "unlimited" with the ability to kneel, crouch, and crawl; and Plaintiff could frequently climb, balance, and stoop. (*Id.* at 10)

In December 2014, Plaintiff visited United Health Centers of the San Joaquin Valley, seeking to "establish medical care." (Doc. 12-12 at 38) Stacia Brandenburg, PA-C, noted Plaintiff requested medication refills, and said he had a history "of psychosis treated successfully with risperidone and benztropine." (*Id.*) Plaintiff told Ms. Brandenburg that he also had back pain for which he "use[d] tramadol occasionally." (*Id.*) Plaintiff requested a referral for physical therapy, which he said, "was helpful in the past." (*Id.*) Ms. Brandenburg observed that Plaintiff's musculoskeletal and psychiatric exams were normal, and he had an "[a]ppropriate mood and affect." (*Id.* at 40) Ms. Brandenburg prescribed risperidone, tramadol, benztropine, and cyclobenzaprine to Plaintiff. (*Id.*)

In March 2015, Plaintiff told Ms. Brandenburg that he was "still doing well on meds" and did not have any "new problems or questions." (Doc. 12-12 at 44) Plaintiff denied feeling down, depressed, or hopeless; and Ms. Brandenburg determined Plaintiff's psychiatric exam results were "normal." (*Id.* at 45-46) She directed Plaintiff to continue the medications as prescribed and to return as needed or within three months. (*Id.* at 46)

Dr. Roger Izzi performed a psychiatric evaluation on November 2, 2015. (Doc. 12-12 at 53) Plaintiff said he could not get along with others and suffered from depression. (*Id.*) He reported he continued to be homeless and would "stay with different family or friends." (*Id.*) Plaintiff told Dr. Izzi that he had "occasional unprovoked crying spells" as well as difficulty sleeping because his mind was "always racing." (*Id.*) Plaintiff described "auditory-type hallucinations," including voices that called his name or yelled for help and said he saw shots. (*Id.* at 54) Dr. Izzi noted that "[a]uditory and visual hallucinations were not observed." (*Id.* at 55) Dr. Izzi opined Plaintiff was "[e]ssentially… fully oriented" because he "could identify the year, month and date." (*Id.* at 54) Plaintiff "was able to immediately recall three words without any obvious difficulty" and recalled one word after a delay. (*Id.* at 55) Dr. Izzi diagnosed Plaintiff with "Unspecified Depressive Disorder," and noted "[h]is mood disorder will fluctuate as his subjective perception of pain fluctuates." (*Id.*) Dr. Izzi opined:

> The present evaluation suggests that the claimant does appear capable of performing a simple and repetitive type task on a consistent basis over an eight-hour period. His ability to get along with peers or be supervised in [a] work-like setting would be moderately limited by his mood disorder. The claimant's mood disorder will fluctuate as his subjective perception of pain fluctuates. Any significant fluctuation of mood would limit the claimant's ability to perform a complex task on a consistent basis over an eight-hour period. On a purely psychological basis, the claimant appears capable of responding to usual work session situations regarding attendance and safety issues. On

a purely psychological basis, the claimant appears capable of dealing with changes in a routine work setting.

(*Id.* at 55-56)

On November 3, 2015, Plaintiff had an internal medicine consultation with Dr. Emmanuel Fabella. (Doc. 12-12 at 59) Plaintiff complained of pain in his left shoulder and "left lateral thigh… with prolonged walking of more than one quarter of a mile." (*Id.*) He also told Dr. Fabella that he was taking " benztropine for medication-induced movement disorder involving some clenching of the hand." (*Id.*) Dr. Fabella found Plaintiff was "able to walk on his toes well" and had "a normal gait and balance." (*Id.* at 61) He determined Plaintiff's range of motion in his back and shoulders was "grossly within normal limits." (*Id.* at 62-63) Plaintiff's strength was "5/5… without focal motor deficits" and his deep tendon reflexes were "2/2." (*Id.* at 63) Dr. Fabella opined Plaintiff had "[l]eft scapular pain of unclear etiology… which may be secondary to chronic strain and which [was] aggravated by lifting moderate to heavy weights." (*Id.* at 64) He also indicated "mild iliotibial band syndrome" should be considered for Plaintiff's mild lateral thigh pain. (*Id.*) Dr. Fabella concluded Plaintiff could "lift and carry 20 pounds occasionally and 10 pounds frequently, limited due to left scapular pain;" sit without restriction "walk and stand six hours out of an eight-hour day secondary to left thigh pain." (*Id.*) He determined Plaintiff could occasionally climb, balance, kneel, crawl, walk on uneven terrain, climb ladders, and work at heights. (*Id.*)

On November 17, 2015, Frances Gilbuena, PA, wrote a letter "to state that Mr. White [was] under the care of" Tulare Community Health Clinic. (Doc. 12-13 at 2) Mr. Gilbuena noted Plaintiff had been diagnosed with schizophrenia and low back pain, and his medications included risperidone, benztropine, tramadol, and ibuprofen. (*Id.* at 2-3)

Dr. Linda Kiger "reviewed the evidence in [the] file in November 2015, and affirmed the assessment of Dr. Nasrabadi, concluding Plaintiff could perform medium work with postural limitations. (Doc. 17-7 at 27-28)

Dr. Harvey Bilik reviewed the record related to Plaintiffs' request for reconsideration on November 29, 2015, including available treatment notes and the consultative examination findings. (Doc. 12-7 at 24-26) Dr. Bilik also noted that a "prior folder" included a consultative examination in

9

August 2012 with Dr. Schmidt, who found "no sig[nificant] impairment from mental disorders." (*Id.* at 26) Dr. Bilik opined the record "suggest[ed] mild-moderate range of severity for any ongoing functional limitations resulting from mental disorders alone." (*Id.* at 25) He determined Plaintiff had mild restrictions of activities of daily living; moderate difficulties in maintaining social functioning; and moderate difficulties in maintaining concentration, persistence, or pace. (*Id.*) Dr. Bilik gave "great weight" to the findings of Dr. Izzi and concluded Plaintiff could "carry out simple instructions over the course of a normal workweek." (*Id.* at 26, 30)

**B.  Administrative Hearing**

Plaintiff testified before an ALJ at a hearing on October 24, 2017. (Doc. 12-6 at 43) The ALJ informed Plaintiff of his rights to chose to postpone the hearing to appoint a representative or proceed at the hearing without a representative. (*Id.* at 45-46) Plaintiff elected to proceed without counsel and executed a "Waiver of Representation." (*Id.* at 48)

The ALJ confirmed that Plaintiff had submitted medical records and had received a copy on CD. (Doc. 12-6 at 58) Plaintiff reported he "had an opportunity" to review the record but "didn't login properly" so he was unable to do so. (*Id.* at 48-49) The ALJ inquired whether Plaintiff was "aware of any additional information" that he needed to obtain, and Plaintiff stated: "Well pretty much, as long as you guys have all the information that I sent you, you should have just about everything … except for … a new medication, that they just put me on within the past couple months." (*Id.* at 49) Plaintiff reported he was put on Neurontin and "sent that paper in," but it was returned to Plaintiff. (*Id.* at 49-50)

**C.  The ALJ's Findings**

Pursuant to the five-step process, the ALJ determined Plaintiff not engaged in substantial gainful activity since the application date of May 7, 2014. (Doc. 12-3 at 35) Second, the ALJ found Plaintiff's severe impairments included "musculoligamentous strain/sprain of the lumbar spine, left scapular pain of unknown etiology, left thigh pain of unknown etiology, and unspecified depressive disorder, formerly diagnosed as schizoaffective disorder, bipolar type." (*Id.*) At step three, the ALJ determined Plaintiff's impairment did not meet or medically equal a Listing. (*Id.* at 35-37) Next, the ALJ found:

> [T]he claimant has the residual functional capacity to perform light work as defined in 20 CFR 416.967(b), except the claimant can frequently climb ramps, stairs, ladders, ropes and scaffolds, and frequently balance, stoop, kneel, crouch, and crawl. The claimant must avoid concentrated exposure to extreme cold, wetness, or humidity, and the claimant's work is limited to simple, routine[] instructions. The claimant is also limited to no overhead reaching with his dominant, left upper extremity.

(*Id.* at 37) At step four, the ALJ noted Plaintiff had "no past relevant work at the level of substantially gainful activity." (*Id.* at 44) At step five, with the above residual functional capacity, the ALJ determined there were "jobs that exist in significant numbers in the national economy that the claimant can perform." (*Id.* at 45) Thus, the ALJ concluded Plaintiff had not been disabled as defined by the Social Security Act since May 7, 2014. (*Id.* at 46)

**D.  Evidence Presented to the Appeals Council**

Seeking review of the ALJ's decision, Plaintiff submitted over 180 pages of evidence to the Appeals Council while his request for review was pending. The Appeals Council addressed the documents as follows:

> You submitted medical records from Adventist Health dating from March 17 2011 to December 5, 2016 (Pages - 39); from Ampla Health Lindhurst Medical dating from April 13, 2017 to April 25, 2017 (Pages - 11); from Altura Centers for Health dating from June 8, 2015 to September 29, 2017 (Pages - 52); and from Kaweah Delta Hospital dating from January 12, 2012 to January 24, 2012 (Pages - 25). We find this evidence does not show a reasonable probability that it would change the outcome of the decision. We did not exhibit this evidence[1].
>
> You also submitted Medical records from Kaweah Delta Health Care dating from February 18, 2018 to June 21, 2018 (Pages - 60); and medical records from Altura Centers for Health dated July 9, 2018 (Pages - 6). The Administrative Law Judge decided your case through January 31, 2018. This additional evidence does not relate to the period at issue. Therefore it does not affect the decision about whether you were disabled beginning on or before January 31, 2018.

(Doc. 12-3 at 3)

## **DISCUSSION AND ANALYSIS**

Appealing the decision to deny his application for benefits, Plaintiff argues that "[t]he ALJ erred by failing to develop the record." (Doc. 17 at 1, 10) In addition, Plaintiff contends the Appeals Council "erred by failing to weigh the new evidence submitted." (*Id.*) The Commissioner asserts that

---

[1] The Court presumes this means the Council did not consider this evidence.

11

the ALJ did not have a duty to further develop the record, and the additional evidence "did not affect the ALJ's decision." (Doc. 19 at 9-11, 12)

**A.     Duty to Develop the Record**

A claimant bears the burden to provide medical evidence that supports the existence of a medically determinable impairment. *Bowen v. Yuckert*, 482 U.S. 137, 146 (1987); *see also Tidwell v. Apfel*, 161 F.3d 599, 601 (9th Cir. 1998) ("At all times, the burden is on the claimant to establish [his] entitlement to disability insurance benefits"). As the Supreme Court explained, it is "not unreasonable to require the claimant, who is in a better position to provide information about his own medical condition, to do so." *Bowen*, 482 U.S. at 146 n.5.

On the other hand, the law is well-established in the Ninth Circuit that the ALJ has a duty "to fully and fairly develop the record and to assure the claimant's interests are considered." *Brown v. Heckler*, 713 F.2d 441, 443 (9th Cir. 1983). The Ninth Circuit explained:

> The ALJ in a social security case has an independent duty to fully and fairly develop the record and to assure that the claimant's interests are considered. This duty extends to the represented as well as to the unrepresented claimant. When the claimant is unrepresented, however, the ALJ must be especially diligent in exploring for all the relevant facts ... The ALJ's duty to develop the record fully is also heightened where the claimant may be mentally ill and thus unable to protect her own interests.

*Tonapetyan v. Halter*, 242 F.3d 1144, 1150 (9th Cir. 2001) (citations and quotation marks omitted).

Importantly, the law imposes a duty on the ALJ to develop the record only in limited circumstances. 20 C.F.R § 416.912(d)-(f) (recognizing a duty on the agency to develop medical history, contact medical sources, and arrange a consultative examination if the evidence received is inadequate for a disability determination). Accordingly, the duty to develop the record is "triggered only when there is ambiguous evidence or when the record is inadequate to allow for proper evaluation of the evidence." *Mayes v. Massanari*, 276 F.3d 453, 459-60 (9th Cir. 2201); *see also Tonapetyan,* 242 F.3d at 1150 ("[a]mbiguous evidence, or the ALJ's own finding that the record is inadequate to allow for proper evaluation of the evidence, triggers the ALJ's duty to conduct an appropriate inquiry").

Plaintiff contends "[t]he ALJ erred by failing to develop the record and adjudicating [his] claim based on medical treatment notes that covered only 8 months of a 3-year and 7-month relevant period." (Doc. 17 at 10) Plaintiff argues the ALJ erred by adjudicating his claim "based only upon 27

pages of medical treatment notes from the relevant period, and the opinions of one-time consultative examiners." (*Id.*)

Despite Plaintiff's statement that only eight months of relevant evidence were encompassed in the treatment records, the ALJ received—and reviewed—records relating to Plaintiff's medical history dated from January 2012 through November 2015. (*See* Doc. 12-3 at 38-44; *see also* Docs. 12-8, 12-9) In addition, the ALJ specifically asked Plaintiff whether he was "aware of any additional information" that needed to be submitted for consideration at the hearing, and Plaintiff indicated that he "should have just about everything," except for information regarding a new medication that he was put on in the past couple months. (Doc. 12-6 at 49) The ALJ's reliance upon Plaintiff's statement that he had submitted all relevant records was not improper.

Further, the record before the ALJ included the opinions of four physicians who examined Plaintiff and made objective findings regarding his physical and mental limitations following his application for benefits. (*See* Doc. 12-12 at 23-27, 30-35, 53-56, 59-65) Notably, the reports of consultative examinations are one method that may be used by the Agency to supplement an inadequate record. *See* 20 C.F.R. § 404.1519a(b), 416.919a(b) ("We may purchase a consultative examination to try to resolve an inconsistency in the evidence, or when the evidence as a whole is insufficient to allow us to make a determination or decision on your claim"). The findings of four consultative physicians were included in the record before the ALJ, who clearly considered the objective findings of Drs. Portnoff, Van Kirk, Izzi and Fabella in reaching his decision regarding Plaintiff's residual functional capacity. (*See* Doc. 12-3 at 40-44) Plaintiff fails to demonstrate this evidence was ambiguous or insufficient for the ALJ to evaluate the abilities and limitations caused by his impairments.

Because the record before the ALJ was not inadequate for a decision to be made, the ALJ's duty to further develop the record was not triggered. *See Thomas v. Barnhart*, 278 F.3d 947, 978 (9th Cir. 2002) (duty not triggered when the medical report was adequate to make a disability determination); *Mayes*, 267 F.3d at 459-60.

**B.     Review by the Appeals Council**

The Regulations govern when Appeals Council must review additional evidence submitted

after the ALJ issues a decision. *See* 20 C.F.R. §§ 404.970, 416.1570 (effective January 17, 2017). The Regulations indicate that the Appeals Council "will review a case if ... the Appeals Council receives additional evidence that is new, material, and relates to the period on or before the date of the hearing decision, and there is a reasonable probability that the additional evidence would change the outcome of the decision." 20 C.F.R. §§ 404.970(a)(5), 416.1470(a)(5). Evidence is new if it is not duplicative or cumulative. *Meyer v. Astrue*, 662 F.3d 700, 704-05 (4th Cir. 2011). In addition, evidence can be deemed new if it was not available when the ALJ made issued the decision. *Threet v. Barnhart*, 353 F.3d 1185, 1191 (10th Cir. 2003).

### 1. Consideration of evidence

The Ninth Circuit has distinguished between evidence the Appeals Council "considered" and evidence the Appeals Council merely "looked at" to determine whether the additional evidence was incorporated into the record. The Court explained that evidence the Appeals Council *considered* becomes part of the administrative record as "evidence upon which the findings and decision complained of are based." *See Brewes v. Comm'r of Soc. Sec. Admin.*, 682 F.3d 1157, 1162 (9th Cir. 2012). In contrast, where "the Appeals Council only *looked at* the evidence... the new evidence did not become part of the record." *Amor v. Berryhill*, 743 F. App'x 145, 146 (9th Cir. 2018) (emphasis added); *see also De Orozco v. Comm'r of Soc. Sec*, 2019 WL 2641490 at*11 (E.D. Cal. June 26, 2019) (observing that the Ninth Circuit has distinguished between instances where the Appeals Council formally considered evidence and made it part of the administrative record with instances where the Appeals Council only looked at the evidence). Importantly, where the Appeals Council only looks at the evidence and it does not become part of the administrative record, the Court "may not consider it." *Amor*, 743 F. App'x at 146; *see also Lowry v. Barnhart*, 329 F.3d 1019, 1024 (9th Cir. 2003).

The Appeals Council indicated that it reviewed the new evidence from Plaintiff and determined it: (1) did "not show a reasonable probability that it would change the outcome of the decision" and (2) did "not relate to the period at issue." (Doc. 12-3 at 3) Therefore, the Appeals Council indicated it "did not exhibit this evidence." (*Id.*) Because the Appeals Council did not exhibit and *consider* the evidence but merely looked at it, the documents submitted were not incorporated to the administrative record subject to the Court's review, unless Plaintiff meets his burden to

14

demonstrate the evidence should have been considered. *See Amor*, 743 F. App'x at 146; *Lowry*, 329 F.3d at 1024.

2. Plaintiff's burden

When the Appeals Council fails to "consider" additional evidence that satisfies the requirements of Section 404.970(b) or 416.1570(b), a remand for further administrative proceedings is appropriate. *Taylor v. Comm'r of Soc. Sec. Admin.*, 659 F.3d 1228, 1233 (9th Cir. 2011). A claimant has the burden to demonstrate the evidence should have been considered by the Appeals Council under the Regulations. *See Hawks v. Berryhill*, 2018 WL 6728037 at *4 (M.D.N.C. Dec. 21, 2018) (noting under the amended Regulations, "a claimant's burden to have new evidence considered for the first time at the Appeals Council level" includes "a requirement to show a reasonable probability of a different outcome").

Plaintiff contends the Appeals Council should have considered the additional evidence submitted because it "supplemented the severely underdeveloped record before the ALJ."[2] (Doc. 17 at 10) Plaintiff argues "the treatment records submitted … show that his mental impairments persisted and worsened throughout the relevant period." (*Id.* at 14) Plaintiff notes the records show he was diagnosed with schizophrenia and referred for mental health care in June 2015, after which he had a consultation for services. (*Id.*, citing AR 102, 109, 117 [Doc. 12-4 at 43, 50, 58]) Plaintiff reports that during the consultation, he "felt like a bomb that may explode; he endorsed hearing voices and was paranoid;" and was observed to be "unkempt, with intense eye contact, anxious and mistrustful attitude, constricted affect, incongruent smiles, rapid speech, tangential thought processes, paranoid and suspicious thought content, minimal insight, and impaired judgment." (*Id.*, citing AR 104 [Doc. 12-4 at 45]) Plaintiff also observes:

> Subsequent psychotherapy treatment notes document a GAF of 41, and unimproved functional status in November and December 2015. Ar. 93-100. Consistent with Plaintiff's subjective complaints and the opinions from Dr. Izzi and Dr. Portnoff, Plaintiff's social difficulties were affirmed by treatment records in August 2016, documenting an altercation with his medical providers. Ar. 199. His medications were continued through 2016 Ar. 57-58, 197-98. In April 2017, he complained of down mood, apathy, anhedonia, decreased energy, decreased motivation, problems getting to

---

[2] Plaintiff does not dispute the Appeals Council's finding that some of the evidence submitted failed to "relate to the period at issue," as it post-dated the ALJ's decision. (See id. at 6, n.1) Plaintiff's argument focuses only on the evidence dated March 2011 through September 2017, which the Appeals Council did not exhibit.

15

> and staying asleep, feeling tired, anxiety and nervousness, auditory hallucinations, and generalized paranoia. Ar. 51. Mental status examination revealed Plaintiff's thought process was concrete and somewhat paranoid, and his mood and affect were anxious. Ar. 52. In September 2017, he displayed deficient fund of knowledge, forgetfulness, poor attention span, and disjointed concentration. Ar. 81.

(Doc. 17 at 14-15) The Commissioner argues that "the evidence submitted to the Appeals Council did not differ from diagnoses already in the record." (Doc. 19 at 13) The Commissioner maintains, "There simply is no reason to believe that any of this information would make a difference to the ALJs findings." (*Id.*)

Significantly, Plaintiff fails to identify objective findings in the additional records that undermine the ALJ's findings regarding his mental abilities and limitations, or the conclusion that Plaintiff was capable of work that involved only "simple, routine[] instructions." Indeed, Plaintiff has identified several *subjective* statements and observations regarding his demeanor but no new objective findings regarding his mental abilities and limitations. For example, though Plaintiff reports the new evidence shows his difficulties with social functioning and concentration, these difficulties were previously noted by Drs. Portnoff and Izzi at the consultative psychiatric examinations.

Dr. Portnoff believed Plaintiff appeared occupied and his thought process was "coherent but mildly rambling and occasionally tangential." (*See* Doc. 12-12 at 25) Dr. Portnoff evaluated Plaintiff's memory and concentration by asking him to recall three words immediately and after a delay, and concluded Plaintiff was "able to perform simple and repetitive tasks." (*Id.* at 26) Likewise, Dr. Izzi tested Plaintiff's concentration and found Plaintiff "was able to immediately recall three words without any obvious difficulty" and recalled one word after a delay. (*Id.* at 55) In addition, Plaintiff told Dr. Izzi that his mind was "always racing" and he could not get along with others. (*Id.* 53) Despite this, Dr. Izzi concluded Plaintiff was "capable of performing a simple and repetitive type task on a consistent basis over an eight-hour period." (*Id.* at 55) Further, as the ALJ noted, Dr. Izzi opined Plaintiff had moderate limitations "in his ability to get along with work peers and supervisors," but also indicated medication adherence and "staying on a proper regimen, … would alleviate the claimant's limitation to work with peers or the public." (Doc. 12-3 at 41-42) Plaintiff fails to identify objective testing or evidence in the record that undermines these conclusions. Thus, the Appeals Council did not err in concluding Plaintiff failed to meet his burden to show "a reasonable probability that it would

change the outcome of the decision." *See Matthews v. Shalala,* 10 F.3d 678 (9th Cir. 1993) ("mere existence of an impairment is insufficient proof of a disability"); *see also Nottoli v. Astrue,* 2011 WL 675290, at *3 (E.D. Cal. Feb. 16, 2011) ("recitation of a medical diagnosis does not demonstrate how that condition impacts plaintiff's ability to engage in basic work activities").

Because Plaintiff fails to show the additional evidence was "new, material, and relates to the period on or before the date of the hearing decision" and that there was "a reasonable probability that the additional evidence would change the outcome of the decision," he fails to demonstrate error by the Appeals Council in merely looking at the evidence and not incorporating it as exhibits into the administrative record. *See* 20 C.F.R. §§ 404.970, 416.1570.

## **CONCLUSION AND ORDER**

For the reasons set forth above, the Court finds the ALJ did not have a duty to further develop the record, and Appeals Council did not err in declining to consider the additional evidence submitted by Plaintiff. Accordingly, the Court **ORDERS**:

1. The decision of the Commissioner of Social Security is **AFFIRMED**; and
2. The Clerk of Court is DIRECTED to enter judgment in favor of Defendant, the Commissioner of Social Security, and against Plaintiff Thomas Joseph White.

IT IS SO ORDERED.

Dated: **February 27, 2020**         **/s/ Jennifer L. Thurston**
UNITED STATES MAGISTRATE JUDGE